Good morning, your honors. I am David McGee, along with my partner Mark Huff. We represent the petitioners in this case who I will refer to as the Watts family for simplicity. This case arises out of a sale that took place in 2007 of Edmund Watts Golf Shops. Prior to the sale, Edmund Watts, the Watts family, had sold 80% of their interest in the Watts Golf Shops to a venture capital firm out of New York by the name of Wellspring. In 2007, there is a sale of those interests. At the time, the Watts family owned 20% of the stock in the company. They had a 20% interest in the company. The majority interest, 80%, was accomplished in a purchase agreement. In that purchase agreement, the Watts family agreed that despite the fact that they owned 20% of the stock, all of the proceeds of the sale could go to Wellsprings. This case is about why the Watts family agreed that all of the proceeds of their 20% stock, which they had purchased shortly before for $8 million, could go to Wellspring. On that, on the answer to that question in terms of tax consequences, let me begin by talking about what we do agree on. Both sides, the IRS and petitioners, agrees that the task court judge got it wrong. The task court judge read the partnership agreement, which is important in this case, between the two parties and said that there was a particular provision in there, 3.4C, which required that in any sale of the company, that the valuation of what your interests were, were determined by the liquidation provisions in section 11 of the partnership agreement. It's clear. So if everybody agrees the tax court got it wrong, why wouldn't we just send it back? Because it strikes me as it's a fundamental error by the tax court in misreading the document, and it kind of set the tax court down a path. Well, I don't disagree with that. Having said that, there are other arguments that the IRS has brought that I think justify some argument in this case. Particularly, they go, they cite the Danielson rule. The agreement that the Watts family reached with Wellspring, as testified to by at least three different witnesses at trial, was that there's two offers for the purchase of the Watts golf shops. One's a $120 million offer from Dick's Sporting Goods. One's an $85 million offer from SunTrust. The Watts family did not want to sell to Dick's because Dick's did not need the real estate that was owned by the Watts family that they leased every year at a very profitable rate. The Watts family wanted them to sell, to take the $85 million offer because that preserved their real estate leases. That agreement is not included in the sale agreement to SunTrust. The government, they say the government, the IRS has argued, well, if it's not included in that agreement, then it's not valid. It must have been included in that agreement. And they cite for that proposition the Danielson rule. The Danielson rule holds that having entered into a particular contract, you can't argue later that the form of the, to alter the form of the contract. We suggest that they are wrong about that. First, their suggestion flunks the common sense rule. What they are saying is that the Watts family should have insisted that their agreement with their partner, that if you sell to the lesser offer, if you take the lesser offer, we will give you financial incentives, okay, should have been included in the sales agreement with SunTrust. They should have told SunTrust that they're doing that. Back to Judge Branch's question, if the tax court looked at the wrong agreement, it looked at the partnership agreement rather than the purchase agreement, and the tax court didn't reach whether or not there was a violation or did not interpret the purchase agreement, why shouldn't we send it back so that the tax court can then interpret the purchase whether or not there was an oral agreement separate and apart from the purchase agreement? The fact is most likely you will send it back. There's a good argument for sending it back. We have argued in the briefs that you can make a decision on this based on the evidence already in there. But can we look at the purchase agreement ourselves and there's no, you know, look at the purchase agreement and look at the record, the tax court record, and determine that other than the self-serving testimony of the three members of the Watts family who testified that there was an oral agreement, that there's no evidence to corroborate or support that. And so, therefore, there was no oral agreement because there was no corroboration for a separate oral agreement. First of all, there is significant evidence of the oral agreement. I can talk about that. There's evidence other than the testimony of the three members of the Watts family? I believe that there is, yes, your honor. And what would that be in this record? Okay, in this record. First of all, if you go to the partnership agreement, section 10.5, the only way you get to the liquidation provisions, okay, which is what the IRS has argued, is the only way to do that, well, there's two ways. One, you can liquidate the company which didn't happen. The second way is go to section 10.5 of the agreement. Section 10.5 is the bring-along provisions. The IRS does have the power, the wellspring did have the power to force the Watts family to sell their stock under section 10.5. But the evidence in this case is very clear that that's not what happened. If you look at 10.5, and there's a number of reasons for that. The question is, why does Watts get nothing out of the sale? The IRS is suggesting, well, 10.5 must have been invoked, could have been invoked. Well, 10.5 must be in writing, all right? You look at 10.5B, it says if you're going to force them to sell, you've got to do it in writing. There is no such writing produced. Nobody's mentioned a writing. There is not a hint that there is a writing.  There's an $85 million offer. There's a $120 million offer. Watts wants them to take the $85 million offer. $35 million less than the other offer. The commissioner's argument is that the wellspring forced them to take the $85 million offer, ignoring the $120 million offer. That makes no sense at all. The fact that they took the offer that Watts' family needed to protect its financial interests suggests there is a negotiation, not a forced sale. But no one from Wellspring presented any testimony at trial, correct? No. No, Wellspring did not testify. And they make a point on it. But if you look at this, look at the purchase agreement, and look at the partnership agreement, this is a very complicated tax-driven agreement. You could conclude easily that it was uncomfortable for Wellspring to get up and swear in tax court as to what the tax consequences of this deal were. And they would do that if we remanded it back to the tax court and the tax court conducted an evidentiary hearing? If the tax court conducted an evidentiary hearing, the government could subpoena Wellspring. But I doubt... Look, you're talking about a deal that happened in 2007, 11 years ago? I've talked to Wellsprings at length. The fact that you're going to get from Wellsprings what actually happened? Problematic. But let me go... Is your argument going to cause any tax consequences to Wellspring? The argument that you're advancing today about what the tax consequences should be for your clients? I do not argue what the tax consequences should be. I do think that there are some very strange provisions in there. It's like the initial capital provision in there. They include a $52,750,000 note as part of their capital. Well, how do you do that? Does that affect the basis of their sale? I don't know. So you're not commenting on tax consequences for Wellspring, but you are commenting on tax consequences for your client, what they should be. And can you clarify for me, assuming everything happened the way that you said that it did, what exactly is your legal theory regarding the tax consequences of this transaction for your client? The Watts family had a right to 20% of the sale, proceeds of the sale of the company, all right? They gave up that right. They traded that right in order to protect their lease interest, their real estate lease interest. That, because they gave up the right to receive approximately $8 million in the sale, all right, in order to get them to sell to the company that needed their leases. That $8 million was expended for the purpose of protecting the leases that would, under the law, and we've cited there's three or four cases in there, you would capitalize that and amortize it over the length of the leases. You've also, you've mentioned that it's an abandonment of partnership interest, so does that factor in as well? It's an abandonment of partnership interest? It is an abandonment. That's a secondary argument, but I think the first argument is the better of the two. Let me go back, if I can, and point out one other thing that indicates that this is, in fact, negotiated. If you look at the, if you look at the sales agreement, there is in there, Edwin Watts signed a non-compete agreement. Edwin Watts signed a non-solicit agreement in the sale, in the $85 million sale. If you look at 10.5, they can't force him to sign a non-compete. They can't force him to sign a non-solicit. In fact, you can't sell that company without a non-compete from Edwin Watts because nobody's going to buy Edwin Watts Golf Shops if Edwin Watts has the right to open up Edwin Watts' brand new golf shop next door and compete with you. So the fact that there is, that Edwin Watts, nothing required in the partnership agreement, agrees to a non-compete tells you that this is, this is a negotiated deal. What did Edwin Watts get out of this? Edwin Watts got, they sold to the $85 million bidder who needed their lease interest and not to the, and not to the $120 million bidder. My question, were all these arguments made to the tax court already? Probably not, probably not with the emphasis now, probably not the detail. The issue of the liquidation provisions was not argued really at length by either side at the tax, this all comes up at the very last minute on the last day of the tax court trial. Is there any evidence in this, in the record before the tax court that when Wellsprings sold to Sun Capital, there was any transfer of money into a Watts account and then back? No, there was no, there was no transfer to Watts and back. The agreement was you keep our proceeds. And they signed a sale agreement which said they could keep the proceeds. The reason they did that was Wellsprings' agreement to sell to the, take the $85 million offer instead of the $120 million. The incentive to get them to do that was we will let you keep our proceeds and we will allow you to make the sale by signing the non-competing. Why would Wellsprings have done that when they could have in any one of several ways required that they get their $85 million investment back as a matter of priority? I disagree that there are several ways to do that. The only way to do that is a forced sale under 10.5. And a forced sale is a theoretical possibility but not a practical possibility. Why was it not a practical possibility? Because you cannot force Edwin Watson to not compete. You can't force him to sign the non-compete. And if they were going to force him, they would have forced him to take the $120 million offer, not the $85 million. If you look at the documentation in this, this is clearly a negotiated deal. It's either the two alternatives presented are forced or negotiated. The evidence all suggests it's a negotiated deal. We gave them, we the Watson family gave them the proceeds that we were entitled to and a non-compete so they could sell it. Totally aside from all of this, is it not pretty clear that the Danielson rule controls here? No, sir. The Eleventh Circuit has adopted it. Danielson rule says that you cannot change the form of the contract. We do not seek to change the form of the contract. The contract is the contract. The question is why we entered into that contract. No, I don't agree with you on that. The form of the contract that you suggest is this, that I call them the Watts entities that entered into this arrangement, the Goff entities. They got, you say, what, $20 million or $17 million? I'm of your 20%. You got that much money. You then distributed that down to your shareholders, the Goff entities shareholders, who then contributed it to the real estate entities as a capital contribution, who then gave it to Wellspring. That is your structure. That structure is certainly different from what happened. Well, let me say this. Both the Watts benefit directly from the leases. The Watts has expended money on this so that they could benefit from the leases. I understand the bottom line is the same, but the structure is not. And anybody who knows anything about tax law knows that the structure is extremely important. In fact, if the Goff entities had earnings and profits, that would have been a dividend taxable to the shareholders. I think if you look at the, we've cited some New York law in there which parallels the Danielson rule but has a very common sense response, which is you look at the context of the transaction. And if in the context of the transaction it makes no sense to have that agreement encompassed in the purchase and sale agreement, then it doesn't have to be in there. We don't argue to change the form of the contract. We only argue the tax consequences of the contract. It makes no sense to tell SunTrust that we're pressuring our partners to sell to you rather than these other guys, and we're giving them financial incentives. The context of the transaction tells you it's illogical to do that. The Danielson rule, as formed, says only if you challenge the form of the contract. We don't challenge the form of the contract. The question is why we've entered into that contract, why we agreed to it. We had a separate agreement with Wells Fargo. Have you got any case that suggests the point you're making that the form of the contract is not a direct sale with all the money going to Wellspring? Do you have any case that says when you have a structure like that, you agree the structure of this transaction is a straight sale, all of the money goes to Wellspring? The case law is, what the case law says is that Danielson applies only if you challenge the form of the contract, and we say there's nothing wrong with that. Is there a difference between the form and the structure of the transaction? Form in what? The structure of the transaction. Is there any difference between that and the form? It seems to me they're the same. I'd have to go back and look at the cases. I've not looked at that particular issue. What they do say is that if you challenge the form of the contract, and in this case it makes no sense at all for us to have included in there the agreement that we had with Wellspring on the side, and I don't think the case law requires us to do that. I think the case law requires only that we not challenge. Danielson rule says we cannot challenge the form of that contract, which is for all intents and purposes the structure of that contract. We agreed that they could have the money. The structure, and it seems to me the form, is a straight sale where 100% of the proceeds, sale proceeds, go to Wellspring. With all due respect, I think that begs the question of why would the Watts family agree to give up its 20% interest? Why would they give up $8 million? They had just purchased that stock for $8 million. Why would they give that up? What's the reason for that? And I think on that terms the tax consequences. They gave it up in order to get Wellspring to do a certain thing that protected their leases. They acted to protect the leases, and they gave up their right to $8 million. They owned 20% of the stock, and they gave up that $8 million in order to get Wellspring to do what they needed done to protect the leases. So your argument, as I understand it, is that the Danielson rule does not apply here because your clients are just explaining the tax consequences of the sale to Sun Capital rather than recasting the form of the sale? That's correct. We do not seek to recast the contract. The contract is the contract. We're just trying to explain why we entered into that contract. And we said in United States v. Fort that there's a difference between the two? I'm sorry? Did we say in United States v. Fort that there's a difference between recasting the form of the sale and explaining the tax consequences of the sale? You absolutely did, and Fort's the case we shot in the brief. And all we're doing is explaining the tax consequences. We do not attack the form of the contract or the substance of the contract. We agreed they could have the money. The question's why? And on that terms, the tax consequences. I see my time has long since passed. Thank you, Mr. McGee. Thank you for your attention. We'll hear from Ms. Oppenheimer. May it please the Court, Joan Oppenheimer, the Commissioner. Opposing counsel has overstated his position when he says the parties agree that the tax court got it wrong. All we agreed with is that the court's reasoning was wrong. But the court found, as a factual finding, that taxpayers failed to prove that they were entitled to any cash proceeds from the sale. And because they had no entitlement to cash proceeds, the supposed incentive theory also fails. So in our view, no remand is necessary because this is a factual finding that can be set aside only if it is clearly erroneous. And it is not clearly erroneous, but there are a number of reasons why the tax court got this right when he said they failed to prove that the common shareholders got any proceeds. By relying on the partnership agreement and not the purchase agreement. That's the problem here. Well, that's part of it. But the other part of it is the court was not required to believe taxpayers. First of all, this supposed incentive theory was invented by counsel several years after the tax returns were filed. When the tax returns were filed by the common partners, they claimed an abandonment loss. This alleged incentive agreement only came into being when the IRS audited the taxpayers' returns. So this incentive theory was not the basis of the tax returns. It was produced by counsel at the audit years later. The only evidence in support of it is the Watts brothers' self-serving testimony, which the tax court was not obliged to accept. They did not call Wellspring in support of this incentive theory. And frankly, all they have is an oral agreement. These are extremely sophisticated taxpayers. They alleged in their tax court briefs that they received cash payments of $6 million, which they then used to incentivize Wellspring. Don't you think that sophisticated investors giving $6 million to a partner would enter into an agreement to memorialize this supposed agreement? Well, that's a question, but another question is why would Sun Capital give up $35 million to get back $7 million? Why would Wellspring give up $35 million to get back $7 million? That's another point casting doubt on this theory. Plus, there are two other common partners, Coldfoot Holdings and Matthew O'Toole. They had no lease interest, so they would have no reason to enter into such a transaction because they had no lease interest in the golf shops that would benefit them. So the tax court's finding that the taxpayers did not receive any cash payments is supported not only by the purchase agreement, but by the entire lack of credibility of the evidence that the taxpayers produced. And to remand this case basically gives them a second bite of the apple to do what they failed to do the first time, namely to produce credible evidence in support of their theory. First of all, and in addition to that, not only did they not produce evidence, but under the Danielson rule, they would have to produce very strong evidence to disavow the form of the transaction. And it is incorrect to say that, as they have to this court, to say they're not trying to disavow the form of the transaction. The form of the transaction is a sale to Sun Capital, and they're adding a separate agreement. They're saying not only was there a sale to Sun Capital, but the money that the common partners received was then given back in a separate agreement to Wellspring to incentivize them to take a different offer so that the leases would be preserved. Well, so that basically this is a different form of a transaction than an outright sale. It's an outright sale plus a separate agreement. And the reason we have the Danielson rule is that one party to the transaction can't disavow the form of the transaction absent proof that between the parties would allow one of the parties to challenge the enforceability of the agreement is to prevent whipsaw. Did the tax court conclusively determine there was no separate agreement? As I'm looking through the opinion, I don't see that. Yes, it did. But it basically, it said on one page of its opinion that they failed to prove that they were entitled to any cash proceeds from the sale, and therefore they had no cash proceeds to enter into the supposed incentive transaction is what the court said. But doesn't that go back to the agreement that the tax court was interpreting, in which I think everybody has agreed there was a misinterpretation of the agreement. But if the tax court did not make the finding, there is no separate agreement. Are we equipped to do that now, or is that something that more properly needs to go back to the tax court? Well, I think, first of all, the court relied. Everybody agrees the court should not have relied on the partnership agreement. There's no question about that. But the court didn't stop there. The court said there was no evidence that they were entitled to cash proceeds, and the court specifically mentioned the testimony of the Watts brothers, which it chose not to accept. It mentioned that the taxpayers did not introduce into evidence wellspring or son in support of its theory. It also said it produced no documentary evidence in support of the theory. So the court didn't simply — But that wasn't the basis for the tax court's decision, though, right? Pardon? That wasn't the basis for the tax court's decision. Well, no. I think it focused primarily on the partnership agreement. But it did also, you know, then say, and furthermore, there's no evidence of the — It also basically disregards the evidence that taxpayers' counsel introduced. And actually, the finding of fact, if it is a finding of fact, that taxpayers failed to prove that they were entitled to any part of the sales proceeds, that demolishes both the theory that the tax court actually held on, which we now know is erroneous, but it also demolishes taxpayers' new theory about this incentive, because if they were not entitled to any of the proceeds from the sale, then the premise of their incentive argument is gone. That is correct. And their incentive theory would whipsaw the commissioner, because in the government's tax court brief, we stated that without the incentive theory, Wellspring, the entire gain, Wellspring received — or if it was a gain, it was a capital transaction, it would be treated as capital gain or loss. But if the incentive theory were upheld, then 80 percent of the money that Wellspring received would be taxed as capital gain or loss, and the remaining 20 percent would be — which it received as incentive would be taxed as ordinary income. So basically, the tax consequences to Wellspring would change if the incentive theory were upheld, and it was — that is one of the reasons this and the other courts have held that the taxpayer is bound by the form of the transaction and that the taxpayer cannot be allowed to, you know, unilaterally change the form in which he has the transaction. In the whipsaw argument, it seemed to me that there were several ways by which Wellspring could have forced the application of paragraphs 10.9 and 11.2 so that they would — Wellspring would get priorities. The first $85,000, which was their investment, would come to Wellspring. Nothing would come to the Watts entities. The taxpayer makes an argument that I hadn't seen in the brief, which does support the taxpayer in this sense. He says that without the non-compete agreement, nobody would have bought this Watts business, and therefore that — the fact that there was such a non-compete indicates — is evidence of the fact that this was a negotiated deal and not something that Wellspring simply forced. It's bring along rights, for example. Can you answer that? This is the first time I've heard of the argument, and I am unable to address it. If the court wants, we can file a supplemental brief on this issue if the court would like me to do that. So he didn't argue before that — I have never seen that argument before. It's not in any of the briefs before this court. As far as I know, it's not in the tax court briefs. I'd request the court to disregard it. It would, if it is true. It would seem to suggest his — support his argument that it was a negotiated settlement and not one that was forced by Wellspring to bring along rights or otherwise, would it not? Well, it may support the argument, but I don't think that gets him to where he wants to go because one of the things that the purchase agreement says — the purchase agreement contains a list of leases that Gulf Shop occupied and noted that each lease is valid and binding on Gulf Shop and in full force and in fact. So one of the things that by precluding — that there were two potential purchasers to Exporting Goods Store and Sun Capital. So one of the things that the common shareholders, or at least the two Watts brothers, got by virtue of the purchase agreement is a statement that leases were valid and binding on Gulf Shop and in full force and effect. And that enabled them — enabled the two Watts brothers to preserve a lot of income. Now, opposing counsel's opening and reply briefs are inconsistent as to exactly how much money the Watts brothers got as a result of the validity of the leases. Their opening brief refers to it preserved $20 million. The reply brief at one point says it preserved $28 million and then later it says $30 million in revenue. So one of the things that they got, the common shareholders got, even though they got no money, is that leases were preserved. And this suggested it was a negotiated agreement too. It doesn't — I don't think you have to go to any non-compete clause to talk about negotiation. But as I've said, if the court wants us to address the non-compete clause in a brief, we could do so. Although, this is the first time it has been brought before this court. Is there anything in the record before the tax court that shows how Wellspring characterized this transaction for tax purposes? As far as I know, there isn't. But the Danielson rule, although it uses the potential of WIPSA as one of the reasons for the rule, it also — the cases also say that it's not necessary for the commissioner to prove WIPSA in order for the Danielson rule to apply. All, you know, all there has to be is the theoretical potential for WIPSA. Do you recall offhand what page of the tax court opinion that this finding appears to the effect that the taxpayers failed to prove their entitlement to sales? Page 26. I think that's right. Thank you. So to sum up, it's our position that taxpayers' incentive theory — the tax court after a trial rejected the incentive theory for failure of proof and that taxpayers should not be given a second bite of the apple in this case. Thank you. Thank you, Ms. Oppenheimer. We'll hear again from Mr. McGee. Judge Anderson, I'd like to begin by addressing one of the things you said, that you believe there were several ways by which Wellspring — at page 26, the tax court said petitioners failed to establish that they were entitled to any cash proceeds from the sale. I think that conclusion turns on their analysis of 3.4C, and 3.4C says it's determined only by the liquidation provisions, that you have to determine what their value is by the liquidation provision. And to the extent that anyone would suggest that there's no evidence that there was an agreement of this type, they're just wrong. The evidence is there. There is the consent agreement. There is the absence. And the tax court does not really — its decision does not turn on 10.5. That's the IRS's argument primarily. There's only one way to get to the liquidation provisions, absent of liquidation, and that's 10.5. The question here is, is there a forced sale under 10.5, or is there a negotiated sale? All of the evidence, the documents that are in, and the testimony, which is consistent with the documents that are in there, says that this was a negotiated sale. Each side got something in the sale. That's the logic of it. Judge Anderson, another thing you said is that they were entitled to, I think you said $85 million because that was their initial capital. They're not entitled to $85 million. If you read that provision carefully, and the tax court acknowledges this at footnote 16, you have to subtract from the $85 million the preferred retirement obligation of $52,750,000. What they were entitled to, if you get to the provisions,  you subtract 85.5, you subtract 32.5. They got more than that. They got more than 85 less 52.750. That's another reason. They argued about Matthew O'Toole, that he didn't get any cash. Matthew O'Toole got $200,000 in cash. He owned 0.5%. If it's a $40 million sale, as we contend, that is 0.5%. Matthew O'Toole was a partner at Wells Fargo. He was not a watch brother. He did get cash. Now, they characterized it as something other than the sale of his stock. They said it's a consulting agreement. But it is exactly the value of his stock that he got. They, in arguing that this should not go back, I would invite you to their brief at page 36. Or wait. Page 35 and 38. At 35, they say, I quote, We agree with taxpayers that the tax court's reliance on section 3.4C of the partnership agreement was mistaken for the reasons explained in the taxpayer's opening brief. At page 38, they say thus, If this court determines that the tax court erred in its ruling, which it did, the proper course is not to enter decision in taxpayers' favor, but to vacate the tax court's decision and remand for this court as a fact finder to make these determinations in the first instance, or vacate and remand for the court to make a decision based on the facts. They also contend that there is no evidence of such an agreement. There is evidence. All you have to do is go through the paper. The paper's there. How do they get that consent agreement? How do they explain Edwin Watch's consent to the sale? What's the explanation for that? Okay. Why would he consent to a sale when he didn't get his $8 million worth of stock? Why would he do that? Plainly, there's an agreement. Why would Wellsprings sell to the $85 million bidder instead of the $120 million bidder if there is no agreement? Why would they do that? These are Wall Street venture capitalists. You think they gave up $35 million absent some kind of agreement, some kind of deal? Do you really think they could have sold this without Edwin Watch's agreement, Edwin Watch's golf shops, without that consent order or consent? Is she correct that this is the first time that has been argued? I can't tell you with certainty. I can tell you that we put on evidence that John Watch's testimony, okay, John Watch was the, he's the brightest of the guys and the one that explained at great length what the deal was, and what John Watch said was they can't sell without Edwin. They've got to have his agreement to the sale, and we introduced the documents that evidence his agreement, okay? So they had to have his management team and they had to have his non-compete. They couldn't sell this. Nobody's going to buy it. It's not just John Watch's testimony. It's common sense. Who's going to buy Edwin Watch's golf shops if Edwin Watch can't compete with it? So there is evidence. Volume 1, pages 327 through 335, are the non-compete and the non-solicit agreements, okay? It's in the record. It was in the record at the trial. John Watch's testimony talks about it. Give me those again. You just cited the record. It's volume 1 of the record, pages 326 to 335. If I'm not right on, I'm awfully close. Gotcha. There was a deal. We did cut a deal. And they talk about sophisticated taxpayers. They have no evidence of that. Edwin Watch is in his 80s. He testified at trial. Sophisticated is not the word that comes to mind if you read his testimony, okay? He's a guy who started with one golf shop at a golf course in Fort Walton Beach, Florida, was good at selling, ended up with 40 or 50 golf shops, but never got any more sophisticated. Now, he knows numbers. He can write the numbers down and all of that. Tax law, he is lost at sea. And you can read his testimony and see that. To call him a sophisticated taxpayer is wrong. I can't remember which case it is, but we had a case recently where the person didn't want to hire a lawyer. Is that this Edwin? I'm sorry? I can't remember whether it's this case or another one, but we had a case recently where the party was negotiating and he didn't want to pay for a lawyer, so he didn't. That would be Edwin Watch. That is this Edwin Watch. He did not. There were no lawyers. Now, he did have a lawyer, an Atlanta lawyer, look at the agreement after the sale, after he had reached agreement with him. It was a $5,000 fee for a review of the contract, okay? There was no lawyer involved in the negotiations of this contract. It was Edwin Watch and his brother, Ronnie, who negotiated this. These are the guys that run pro shops and golf courses. They're good at selling golf clubs. To suggest that they're sophisticated with regard to the tax laws of the United States is completely wrong. Thank you, Mr. McGee. Thank you, sir. Mr. Oppenheimer.